UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
────────────────────────────────────────

MICHAEL MACK,

                Plaintiff,

   -against-                                    1:11-CV-189
                                                        (NAM/RFT)

WARREN COUNTY CORRECTIONAL
FACILITY,

                Defendant.
────────────────────────────────────────

APPEARANCES:                                OF COUNSEL:

THE DELORENZO LAW FIRM, L.L.P.       Thomas E. DeLorenzo, Esq.
670 Franklin Street, Suite 100
Schenectady, New York 12305
*Attorneys for Plaintiff*

LEMIRE JOHNSON, L.L.C.               Gregg T. Johnson, Esq.
2534 Route 9                                      Mary Elizabeth Kissane, Esq.
P.O. Box 2485
Malta, New York 12020
*Attorneys for Defendant*s

**Norman A. Mordue, Senior U.S. District Judge**

## MEMORANDUM-DECISION and ORDER

**I.    INTRODUCTION**

In this action, plaintiff asserts that he was subjected to unlawful discrimination by defendant based on a disability in contravention of the Americans with Disabilities Act ("ADA"), 42 U.S.C. Section 12101 *et seq.*. Plaintiff's complaint also asserts an unlawful discrimination claim pursuant to the New York Human Rights Law ("NYHRL"). Defendant moves for summary judgment dismissing plaintiff's claims. Plaintiff opposes defendant's motion.

**II.   RELEVANT FACTUAL BACKGROUND**

The Court notes that a substantial number of the facts in this matter are undisputed. After taking and passing a written examination and meeting other Civil Service qualification

requirements, including a physical examination, Warren County appointed plaintiff as a Correction Officer at the defendant Warren County Correctional Facility ("WCCF") from a Civil Service list of eligible candidates on April 4, 2004. All corrections officers assigned posts within the secure area of the WCCF are responsible for responding to emergencies, including such incidents as restraining inmates. During plaintiff's active employment with the County, he primarily worked the night shift at the Warren County Jail, which is undisputedly the shift on which contacts between Correction Officers and inmates was most limited.[1]

Insofar as plaintiff's work performance, his Annual Performance Evaluation Report ("APER") for 2005 indicated he met all the standards required by the WCCF of a Corrections Officer and stated plaintiff showed "excellent initiative in a lot of his work." Plaintiff was "always willing to do whatever detail that came up" and "accept[ed] short notice changes in work schedule without any complaint." In 2006, there is no reference in the record as to whether plaintiff met all required standards of a Corrections Officer on his APER but the report stated his "initiative has yielded numerous findings of contraband within the facility" and "[h]e does not wait to be instructed by a supervisor to perform his duties." In 2007 and 2008, according to plaintiff, he met the "supermajority" of all standards required on his APER "except for two minor incidents" which did not result in disciplinary action and were resolved.[2]

---

[1] Defendant asserts in its Rule 7.1 Statement of Undisputed Material Facts that in spite of the "limited" contact plaintiff had with inmates, he was still required to physically restrain inmates three to four times per year. The pages of plaintiff's deposition transcript referenced after this assertion are not attached to defendant's motion papers. Fortunately for defendant, plaintiff also submitted his own deposition transcript in its entirety for the Court's reference.

[2] Plaintiff's APER for 2007 noted he "needed improvement" in two areas - observance of work hours and attendance. The report indicated plaintiff "had problems showing up for work on time." According to the report, "he was talked to and explained that he had problems. Since he was talked to he has showed up to work on time." The report further stated that plaintiff had used a few sick days throughout the year and "sometimes made longer weekends by doing so." Plaintiff's APER for 2008 again showed that he "needed improvement" in the area

2

In April 2009, plaintiff sought and received a leave of absence under the Family Medical Leave Act ("FMLA") to have back surgery for a condition that was not work-related. Plaintiff's back surgery, which entailed multiple spinal fusions, was performed on May 28, 2009. Plaintiff requested and was approved to take FMLA leave from May 27, 2009, through September 1, 2009.

In October 2009, after expiration of plaintiff's leave of absence, plaintiff approached his supervisor, Captain Oates, and verbally inquired about the prospect of resuming his active employment (i.e., returning to work) with restrictions resulting from his spinal fusion. Those proposed restrictions included a prohibition against lifting more than 20 pounds and a limited work day of only 8.5 hours a day. According to plaintiff, Gates was "willing to concede" the restriction on the limited work day of no more than 8.5 hours per day. However, when it came to the lifting restriction, Gates said that would prevent plaintiff from returning to work "in any fashion." Gates told plaintiff there were no "light duty posts" within the WCCF because all Correction Officers working within the secured area of the jail had to be available to respond to emergency situations that arose, including physical intervention with inmates during inmate conflicts; physical restraint of inmates as well as transport, evacuations and medical emergencies involving inmates. Plaintiff inquired of Gates about the possibility of working in central control or as transport or some other capacity that would allow him to get by on the restriction and Gates was firm. As a Corrections Officer, plaintiff was told that "he was required to do the job of a Corrections Officer which means the full jail operations."

According to Gates, plaintiff had reported to him during this conversation about returning to work in October 2009, that the lifting restriction would be placed on him for the rest of his life.

---

of attendance. To wit, the report stated plaintiff had used 10 sick days in 2008 and 6 of them were "attached" to pass days, or used to extend scheduled leave time. Plaintiff was also formally counseled in July 2008 concerning the importance of key control to the security of the facility after he left keys to the Linear Housing Unit unattended on a desk at the officer's station.

Gates said plaintiff told him he would never be able to lift more than 50 pounds or safely perform the full duties of a Correction Officer. When plaintiff raised the prospect of resigning his position during this conversation with Gates, Gates encouraged him to think it over before making a decision. Gates claims that he told plaintiff to request a further leave of absence but plaintiff said he did not want to "string the County along."

According to Lieutenant Albert Maday at WCCF, plaintiff also told him he was going to resign because he could not perform the functions of a Corrections Officer with the restrictions placed on him by his doctor. After speaking with Maday, plaintiff left his letter of resignation, on Gates' desk, which was accepted by the County.[3] Plaintiff's employment with the County was terminated on October 22, 2009. A few days later, Maday said that plaintiff stopped by WCCF to surrender his badge, uniform and other equipment. At that time, Maday testified plaintiff told him he was seeking employment at the Finch Paper Company. Plaintiff testified that he first contacted someone at Finch Paper in October 2009 about employment and was hired on a full-time, temporary basis as a traffic coordinator in late January 2010. Plaintiff said he told the traffic manager at Finch Paper at the time he was hired that he was still seeking reinstatement at WCCF.

Plaintiff returned to WCCF in the third week of January 2010 and provided Captain Oates with another note, dated January 20, 2010, concerning his work restrictions from the same physician who had written the previous work release. In this note, plaintiff's physician stated he

---

[3] Plaintiff's October 22, 2009, resignation letter read:

> I regret to inform you I will be resigning my position . . .. The decision has been made because of the spinal fusion I had on May 28, 2009. The surgeon responsible for releasing me back to employment has made it evident she will place a life-time lifting restriction on my work future.

4

could return to work with no restrictions.[4] Plaintiff called Captain Gates shortly after dropping off the new work release note from his doctor and asked to be reinstated. As of January 2010, plaintiff had not re-taken the Civil Service examination which the County offered for the position of Correction Officer, nor had he undergone the other Civil Service qualifying processes such as the mental and physical examinations necessary for placement on the civil service "eligible list." However, according to the County, there was a process pursuant to the Civil Service Rule XVIII which authorized the County Sheriff, in his discretion, to "reinstate" civil service employees under certain specified conditions.[5] In response to plaintiff's verbal request for reinstatement, Captain Gates met with Warren County Sheriff Nathan York.

York testified in his tenure as Sheriff, he could recall only three instances where Corrections Officers who had resigned sought reinstatement pursuant to Rule XVIII. In the first instance, York said the Officer had resigned for medical reasons but was reinstated after his health returned because he was considered a strong Officer. In the second case, the Officer had resigned for personal reasons and was considered a marginal officer and was not offered reinstatement. In plaintiff's case, York said that he asked Gates what kind of officer plaintiff was since he did not know him. Gates told York that plaintiff was a marginal employee who he believed was just doing the job for the paycheck, not a career. York said he then asked Gates if

---

[4] Plaintiff's medical records are not in the record. However, plaintiff was asked about a note in the record of his January 20, 2010, office visit with his physician where she wrote "the patient states that he is not able to return to work if he has any restrictions in place, but that he does not have to do any heavy lifting at his job." When asked "Did you tell Dr. Bahn that?" plaintiff answered that the statement was "inaccurate."

[5] Specifically, the Rule provided that if a Corrections Officer sought to return to service within a year of resignation "the prospective appointing authority must request approval from the Commission/personnel Officer to reinstate an individual" and "[t]he Commission/Personnel officer shall determine if the reinstatement is for the good of the service." As of January 2010, defendant states plaintiff was the only former Corrections Officer seeking reinstatement without having gone through the Civil Service qualification process. Plaintiff was not on the Warren County Civil Service list of eligible candidates that was in effect in January 2010.

there were good candidates on the Civil Service list and Gates said that there were good candidates on the list whose background checks were in progress. York testified that Gates never mentioned anything about plaintiff being disabled. It is undisputed that York knew nothing about the plaintiff's medical or work history.

When asked about his response to the January 20, 2010, note from plaintiff's physician, Captain Gates testified "At this point in time, [plaintiff] is bringing a doctor's note less than 60 days - 90 days later that he had relayed to us that he was going to be permanently disabled . . .." Gates further testified as follows:

> Q: So you had some doubt as to the accuracy of this exhibit N, is that right sir?
>
> A: I questioned, not doubt, I questioned -
>
> Q: Who did you question -
>
> A: I questioned why such a turnaround when three months prior [plaintiff] relayed that information to me.
>
> . . .
>
> Q: At the time when you were thinking about when you received this statement. In your mind, you're thinking about, well, is this really true because a couple of weeks ago he was disabled, now he is not, so when the sheriff said, should we hire him, you said, well, he is a marginal employee?
>
> A: At this point in time, I would not advocate for [plaintiff] without being able . . . confirm that he was fit for duty.
>
> . . .
>
> Q: Did you question the contents of the exhibit at all, number N where it says there are (sic) restrictions?
>
> A: I did, yes.
>
> Q: Who did you discuss it with?
>
> A: Nobody.

Following Gates' conversation with York, plaintiff telephoned Gates to ask again about reinstatement. Gates told plaintiff that York had not approved the reinstatement. According to

6

plaintiff, Gates told him that his reinstatement had been denied because he was a "liability." Gates was not asked about using this word in his conversation with plaintiff during his deposition.

### III.   DISCUSSION

A.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(e).

Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985), the motion will not be defeated by a non-movant who raises merely "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *See Delaware & H. R. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Indeed, the nonmoving party's opposition may not rest on mere denials of the moving party's pleading, but "must set forth specific facts

showing there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e).

With respect to summary judgment in employment discrimination cases, courts have acknowledged "direct evidence of . . . discriminatory intent will rarely be found." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotation marks omitted). Thus, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* A plaintiff must, however, must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment. *See id.* The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a) which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *See Anderson,* 477 U.S. at 250. "It is a gratuitous cruelty to parties and their witnesses to put them through the ordeal of a trial when the outcome is foreordained." *See Mason v. Continental Ill. Nat'l Bank*, 704 F.2d 361, 367 (7th Cir. 1983). It is with these considerations in mind that the Court addresses defendant's motion for summary judgment.

B.      Disability Discrimination under the ADA

The ADA prohibits discrimination by covered entities, including private employers, against "qualified" individuals with a disability. Specifically, it provides that no "covered" employer shall "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is identified as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A person has a disability if he or she (a) has a physical or mental impairment that substantially limits one or more of his major life activities; (b) has a record of

8

such an impairment; or (c) is regarded as having such an impairment. *See* 42 U.S.C. § 12102 (1). The ADA defines "major life activities" to include "caring for oneself," as well as "thinking, communicating, and working." *Id.* at § 12102 (2) (A).[6]

1.     Burden of Proof

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court established the framework for analyzing employment discrimination claims. Although *McDonnell Douglas* involved a race discrimination claim brought under Title VII, courts have applied the same framework to disability discrimination claims brought under the ADA and the NYHRL. *See, Platt v. Inc. Vill. of Southampton*, 391 Fed. Appx. 62, 64 n. 1 (2d Cir. 2010); *Reeves v. Johnson Controls World Servs.*, 140 F.3d 144, 156 n. 9 (2d Cir. 1998) (citation omitted). Under the *McDonnell Douglas* framework, a plaintiff must carry the initial burden of establishing a *prima facie* case of discrimination. *See* 411 U.S. at 802. If the plaintiff succeeds in establishing a *prima facie* case, the defendant employer must then articulate "some legitimate, nondiscriminatory reason" for the alleged adverse employment decision. *Id.* If the defendant employer articulates a legitimate, nondiscriminatory reason for the purported unlawful action, the

---

[6] Subsequent to passage of the ADA, EEOC issued regulations to provide additional guidance regarding the proper interpretation of the term "disability." The regulations define the three elements of disability: (1) "physical or mental impairment," (2) "substantially limits," and (3) "major life activities." 29 C.F.R. §§ 1630.2(h)-(j) (1998). Under the regulations, a "physical impairment" includes "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." *Id.* at § 1630.2(h)(1). The term "substantially limits" means, among other things, "[u]nable to perform a major life activity that the average person in the general population can perform;" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* at § 1630.2(j). Finally, "[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* at § 1630.2(I).

plaintiff is then afforded a fair opportunity to show that the employer's stated reason for the adverse employment action was in fact pretext for discrimination. *Id.* at 804.

Under the ADA, a *prima facie* case requires a showing that (I) the defendant employer is subject to the ADA; (ii) the plaintiff is disabled within the meaning of the ADA or was perceived to be so by the defendant employer; (iii) the plaintiff was otherwise qualified to perform the essential functions of the job either with or without reasonable accommodation; and (iv) the plaintiff suffered an adverse employment action because of his or her disability. *See Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).

2.     Adverse Employment Action

Defendant argues in the first instance that plaintiff did not suffer an adverse employment action since **contrary to the allegations** in his complaint, he resigned from WCCF and was not "terminat[ed.]" Plaintiff does not assert a "failure to rehire or reinstate claim" in his complaint. The Court agrees. Based thereupon, the unlawful discrimination claim under the ADA in the complaint should be dismissed. Assuming without deciding that plaintiff's failure to hire claim was properly before the Court, it would still fail on its merits but not because he failed to demonstrate an adverse employment action as argued by defendant. To wit, defendant contends plaintiff did not "formally" reapply for a job or take a Civil Service test in order to be placed on a list of eligible candidates for the job. Defendant claims that because plaintiff was asking for "special treatment," the County's failure to reinstate him was not an adverse employment action. Defendant is mistaken.

"In failure to rehire cases, the plaintiff usually must show: (I) that he belongs to a [protected group]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection the position remained open and the employer continued to seek applicants from persons

10

of complainant's qualifications." *Nader v. ABC Television, Inc*., 150 F. App'x 54, 56 (2d Cir. 2005) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 242, 253 n. 6 (1981)).  Here, plaintiff requested reinstatement via Civil Service Rule XVIII.  There is no requirement in the statute that a Corrections Officer seeking reinstatement take a Civil Service test or follow any "formal" procedures to be reinstated.  Under the Rule, it is clear that the matter of reinstatement is utterly within the discretion of the "Commission/Personnel Officer."  The record evidence demonstrates that plaintiff requested reinstatement verbally pursuant to Rule XVIII and WCCF continued to seek other candidates from the Warren County list of eligible Civil Service candidates for position(s) of Corrections Officers.  Consequently, plaintiff has shown that he submitted a valid request or application to be reinstated to an "open position" and he was rejected. *See Nandori v. City of Bridgeport*, No. 3:12CV673, 2014 WL 186430, at *9 (D. Conn. Jan. 16, 2014).  This constitutes an adverse employment action sufficient to defeat summary judgment. Plaintiff's failure to meet his *prima facie* evidentiary burden lies in the absence of evidence in the record that he is "disabled" within the meaning of the ADA.

3.      Actual Disability

To establish actual disability under the ADA, a plaintiff must show that (1) he suffers from a "physical or mental impairment," (2) that "substantially limits," (3) a "major" life activity. *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).  Although plaintiff asserted in his complaint that he "is an individual" who is **actually disabled** and has a record of such an impairment within the meaning of the ADA, he appears to have abandoned these claims in opposition to defendant's motion.  Presently, plaintiff only asserts that at the time he sought reinstatement at WCCF, he was "perceived" to have a disability in violation of the ADA.

3.      Regarded as Disabled

As referenced above, an employee who is not actually disabled may nonetheless establish

11

"disability" as defined in the ADA through evidence of adverse employment action based on employer perception of actual disability. *See* 42 U.S.C. § 12102 (2) (C). Until January 1, 2009, when amendments to 42 U.S.C. § 12102 went into effect, *see* ADA Amendments Act of 2008, Pub. L. 110–325, §§ 4(a), 8, 122 Stat. 3555, (2008), a plaintiff seeking to avail himself of the "regarded as" prong of the definition of "disability" under the ADA needed to show that he was perceived as **both** "impaired" and "substantially limited in one or more major life activity." *See Hilton v. Wright*, 673 F.3d 120, 128 (2d Cir. 2012) (citations omitted). In 2008, however, Congress passed the ADA Amendments Act, which substantially reworked the language of Section 12102. *See id.* Among other things, what was formerly subsection (2) (C) became subsection (1) (C) and was amended to include the following parenthetical: "as described in paragraph (3)." *See id. (comparing* 42 U.S.C. § 12102 (2006) with ADA Amendments Act § 4 (a)). Paragraph (3), in turn, was completely new and reads in relevant part:

> (3) Regarded as having such an impairment
>
> For purposes of paragraph (1) (C):
>
> (A)   An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

*See id.* "Lest there be any confusion about the amendment's effect on subsection (1) (C), the Committee Report states:"

> The Committee therefore restores Congress's original intent by making clear that an individual meets the requirement of "being regarded as having such an impairment" if the individual shows that an action (e.g. disqualification from a job, program, or service) was taken because of an actual or perceived impairment, whether or not that impairment actually limits or is believed to limit a major life activity.

*See id.* (citing H.R. Rep. No. 110–730, pt. 1, at 14 (2008).

Moreover, the ADA Amendments Act's "[r]ules of construction regarding the definition

12

of disability" provide that the "definition of disability ... shall be construed in favor of broad coverage of individuals ... to the maximum extent permitted by the terms of this chapter."  42 U.S.C. § 12102 (4) (A).  *Sacks v. Gandhi Engineering, Inc.*, No. 11 Civ. 5778, 2014 WL 774965, at 17 * (S.D.N.Y. February 27, 2014).  Thus, on summary judgment, to establish that he is disabled within the meaning of the ADA Amendments Act, a plaintiff is "only required to raise a genuine issue of material fact about whether [his employer] regarded him as having a mental or physical impairment." *Id.* (citing *Hilton*, 673 F.3d at 129).

Here, plaintiff highlights the portion of Gates' deposition testimony where he was discussing his reaction to the January 20, 2010, work release from plaintiff's doctor.  Plaintiff asserts that when Captain Gates told Sheriff York that plaintiff was a marginal employee, it was because Gates thought he was disabled.  Specifically, plaintiff argues that Gates told plaintiff he was a "liability."  The Court finds that these allegations are not supported by the "evidence" cited by plaintiff in support of them.  Indeed, these allegations amount to nothing more than speculation.  It is evident that when Gates was discussing his "question[s]" about the "content" of the January 20, 2010, note from plaintiff's physician, he was concerned about the **accuracy of the information** in the work release given the fact that plaintiff had presented a contrary note just three months earlier and resigned.  There is nothing in this portion of Gates' testimony which reveals a belief or perception that plaintiff was disabled.  Moreover, Gates' mere use of the word "liability" does not provide evidence that he perceived plaintiff as disabled.  *See Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp.2d 378, 400 (S.D.N.Y. 2012) (citing *Monte v. Ernst & Young LLP*, 330 F. Supp.2d 350, 363–64 (S.D.N.Y. 2004) (finding that "a few vague and isolated remarks" were insufficient to establish discriminatory animus)).

However, even if this remark was sufficient to establish a *prima facie* case of disability discrimination, plaintiff's claim still fails on its merits.  Once a plaintiff has established a *prima*

13

*facie case*, the burden of production shifts to the employer to rebut this presumption by articulating a legitimate, nondiscriminatory reason for its actions. *See Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir.1997) ( en banc ) (*" Fisher III "*), *cert. denied*, 522 U.S. 1075 (1998) (defendant's burden of production is not a demanding one; he need only offer such an explanation for the employment decision). Here, defendant has come forth with a legitimate, non-discriminatory reason for not reinstating plaintiff. Captain Gates testified that he told Sheriff York that plaintiff was a marginal employee. Based on this information, York did not approve plaintiff's reinstatement. It is undisputed that York did not know anything about plaintiff's prior work or medical history prior to making his determination. If a defendant proffers a legitimate, nondiscriminatory reason for a challenged employment action, "the presumption raised by the *prima facie* case is rebutted, and drops from the case." *St. Mary's Honor Center v. Hick's*, 509 U.S. 502, 507 (1993) (internal quotations and citations omitted). "The plaintiff then has the opportunity to demonstrate 'that the proffered reason was not the true reason for the employment decision" and that unlawful discrimination was. *Fisher III*, 114 F.3d at 1336 (quoting *St. Mary's*, 509 U.S. at 507-08).

To the extent that plaintiff argues that when Gates told York plaintiff was a marginal employee, he **must** have viewed plaintiff as disabled, there is simply no evidence in the record to support this inference. Although plaintiff's APERs for his first two years as a Corrections Officer demonstrate that he was performing good work, his APER for 2007 showed deficiency in attendance and observance of work hours. In 2008, plaintiff was still rated on his APER as deficient in the area of attendance and had been formally counseled on the issue of key control. The law is well-settled that an employee alleging unlawful discrimination must show that an employer's proffered reasons for an adverse employment action are a pretext **for discrimination.** *Fisher III*, 114 F.3d at 1339. "[A] reason cannot be proved to be a 'pretext for discrimination'

14

unless it is shown both that the reason was false and that discrimination was the real reason." *Id.* (emphasis in original). Here, plaintiff has demonstrated neither that Gate's assessment concerning his performance was false nor that disability discrimination was the real reason he told York that plaintiff was a marginal employee. Gate's use of the word "liability" - standing alone - does not resuscitate plaintiff's ADA claim. As referenced above, to demonstrate circumstances supporting an inference of discrimination, a plaintiff may not rely exclusively on "stray" remarks made in the workplace. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir.1998); *Woroski v. Nashua Corp.*, 31 F.3d 105,108-10 & n. 2 (2d Cir.1994).

## IV. CONCLUSION

Based on the foregoing, the Court finds that plaintiff has failed to raise a triable issue with respect to his ADA claim. Because the Court elects to dismiss the federal claim in plaintiff's complaint, the Court will not exercise its supplemental jurisdiction to address plaintiff's remaining claim under the NYHRL. Consequently it is hereby

ORDERED that defendants' motion for summary judgment (Dkt # 21) dismissing plaintiff's complaint is GRANTED; and it is further

ORDERED that plaintiff's employment discrimination claim pursuant to the ADA is dismissed with prejudice; and it is further

ORDERED that plaintiff's employment discrimination claim under the NYHRL is dismissed without prejudice.

IT IS SO ORDERED.

Date:   March 31, 2014
        Syracuse, New York

*Norman A. Mordue*
Norman A. Mordue
Senior U.S. District Judge

15